UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Criminal No. 10-251 (JAF) |
| CARLOS SEVILLA-OYOLA (04), | |
| Defendant. | |

## **<u>MEMORANDUM OPINION AND ORDER</u>**

Pending before the court is Defendant's Omnibus Motion Regarding Sentencing ("Omnibus Motion"). (Docket No. 2586.) Defendant's Omnibus Motion contains three motions: A Motion to Recuse, a "<u>Santobello</u> Motion,"[1] and a Motion to Vacate Sentence. (<u>Id.</u>) Regarding the Motion to Vacate the Sentence, we have entered a separate Order setting aside the sentence due to procedural deficiencies in our change-of-plea colloquy. (See Docket Nos. 2587; 2589.) For the reasons set forth below, we now deny the Motion to Recuse and the "<u>Santobello</u> Motion." We also address Defendant's Notice of Appeal, finding it premature. We conclude by outlining some next steps for resolving the present case.

---

[1] <u>Santobello v. New York</u>, 404 U.S. 257, 262 (1971), stands for the proposition that prosecutors must abide by their plea agreements.

1  ### A.  <u>Motion to Recuse</u>

2  Defendant brings a Motion to Recuse, pursuant to 28 U.S.C. § 455 and 28 U.S.C. § 144.[2]

3  (Docket No. 2586.)  Defendant argues that the undersigned judge should be disqualified from

4  concluding this criminal case by sentencing the Defendant due to bias, prejudice, and personal

5  knowledge.  (<u>Id.</u>)   Defendant notes that the standard is an objective one, asking "whether a

6  reasonable person would be convinced" that this judge is biased.  (<u>Id.</u> at 2.)  Though Defendant

7  invokes § 455(b)(1), many of the cases he cites interpret a different section of the recusal

8  statute, 28 U.S.C. § 455(a).  <u>See, e.g.</u>, <u>United States v. Pearson</u>, 203 F.3d 1243, 1277–78 (10th

9  Cir. 2000); <u>In Re United States</u>, 158 F.3d 26 (1st Cir. 1998) (interpreting § 455(a) exclusively).

10  The First Circuit has held that "[r]ecusals are governed by § 455(a)," <u>United States v. Pulido</u>,

11  566 F.3d 52, 54 (1st Cir. 2009), and the Supreme Court has held that "§ 455(a) expands the

12  protection of § 455(b), but duplicates some of its protection as well."  <u>Liteky v. United States</u>,

13  510 U.S. 540, 552 (1994).  We, therefore, consider Defendant's recusal motion under both

14  § 455(a) and § 455(b)(1).[3]

15  Under relevant First Circuit case law, recusal is appropriate when the facts asserted

16  "provide what an objective, knowledgeable member of the public would find to be a reasonable

---

[2] Defendant's motion mentions § 144 only briefly, focusing instead on arguments under § 455.  We note that § 144 contains several procedural requirements, such as the filing of an affidavit, "accompanied by a certificate of counsel of record stating that it is made in good faith." § 144.  The First Circuit has demanded "strict compliance" with these requirements. <u>In re Martinez-Catala</u>, 129 F.3d 213, 218 (1st Cir. 1997).  Because Defendant failed to comply with these requirements, the motion under § 144 fails.  <u>Id.</u>

[3] § 455(a) states that a judge "shall disqualify himself in any proceeding in which its impartiality might reasonably be questioned." § 455(b) states that a judge "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

basis for doubting the judge's impartiality." In re Boston's Children First, 244 F.3d 164, 167

(1st Cir. 2001) (quoting In re United States, 666 F.2d at 695 (1st Cir. 1998)). Because we find

that no such "reasonable basis" exists, we deny Defendant's motion for recusal.[4]

Defendant claims that the court "made manifest its bias in two significant ways." (Id.

at 2.) First, Defendant points to previous public comments by the undersigned judge in matters

that pertain to the administration of criminal justice. (Id. at 2–3; Docket Nos. 2586–1; 2586–2.)

Second, Defendant cites the comments made by this judge at Defendant's first sentencing.

(Docket No. 2586 at 3–4.) Both sets of comments, according to Defendant, demonstrate an

"agenda" stemming from this judge's "dissatisfaction with the local courts." (Id. at 3.) See Tr.

of First Sentencing Hearing, Docket No. 2559.

### 1.      Comments at Sentencing

We can quickly dispatch with Defendant's objections related to our comments at

sentencing. As the Supreme Court has made clear in its discussion of the "extrajudicial source"

doctrine, "judicial remarks during the course of a trial that are critical or disapproving of, or

even hostile to, counsel, the parties, or their cases, ordinarily do not support" a recusal

challenge. Liteky, 510 U.S. at 555. Opinions formed by the judge, when based on facts

introduced during the proceeding, do not support a bias challenge "unless they display a deep-

seated favoritism or antagonism that would make fair judgment impossible." Id. An example

---

[4] We see no need to transfer this motion to another judge, under the circumstances of this case. See In Re United States, 158 F.3d at 34 ("Although a trial judge faced with a section 455(a) recusal motion may, in her discretion, leave the motion to a different judge, no reported case or accepted principle of law compels her to do so . . . .").

of such deep-seated antagonism would be, in a World War One espionage trial of German-Americans, a district court judge stating, "One must have a very judicial mind, indeed, not [to be] prejudiced against the German-Americans" because their "hearts are reeking with disloyalty." Id. (quoting Berger v. United States, 255 U.S. 22, 28 (1921)) (internal quotation marks omitted). Nothing this judge has said in this case approaches this level of antagonism.

Courts in other circuits have similarly found that comments made at sentencing about a defendant do not support a recusal motion. See, e.g., Pearson, 203 F.3d at 1277–78 (finding no grounds for recusal where judge made remarks about defendant's character); United States v. Kimball, 73 F.3d 269, 273 (10th Cir. 1995) (finding that judge's comments about defendant's criminal record, and judge's stated intention that defendant "die in prison," did not require recusal). In this case, this judge considered Defendant's criminal history and uncharged conduct, in light of the relevant statutory sentencing factors pursuant to 18 U.S.C. § 3553. (Docket No. 2586 at 3–4.) See also USSG § 1B1.4 and 18 U.S.C. § 3661. Such comments, based on facts learned during the proceeding, do not support a finding of bias or prejudice under 28 U.S.C. § 455 or 28 U.S.C. § 144. Liteky, 510 U.S. at 555.

### 2.    **Public Comments**

Nor do this judge's public comments on the administration of the criminal justice system and the interplay between federal and state courts provide a "reasonable basis" for doubting this judge's partiality. The First Circuit has acknowledged that there is "little guidance on when public comments, even those on the merits of a pending action, create an appearance of

partiality for which § 455(a) is the remedy." In Re Boston's Children First, 244 F.3d at 168–69.

Nevertheless, the case law suggests that there must be certain "factors at work" to require

recusal, none of which are present here. Id. at 169. Most significantly, none of this judge's

outside comments related to any pending action before the court, and much less against

Defendant. See id.; United States v. Cooley, 1 F.3d 985, 995 n.8 (10th Cir. 1993) (cautioning

judges not to discuss pending cases with the media when public tensions are high). Second, the

judge's comments here were not so ambiguous that they could have been misinterpreted as

pronouncing a view on the pending case. In Re Boston's Children First, 244 F.3d at 169;

Cooley, 1 F.3d at 995 (holding that "appearance of partiality" can arise when judge's ambiguous

comments might be interpreted as predicting a guilty verdict in a pending case). To the

contrary, the outside comments identified by Defendant were specific and directed to other

matters not pending before the court.[5]

---

[5] We reiterate that regarding statements made during judicial proceedings, "myriad cases indicate that courts are loath to require recusal based on statements made in a judicial context." In Re Boston's Children First, 244 F.3d at 169 n.9 (citing United States v. Grinnell, 384 U.S. 563, 581–82 (1966); United States v. Lopez, 944 F.2d 33, 37 (1st Cir. 1991)).

At our hearing on February 22, co-counsel Sandoval had to painfully admit that there was no corroboration for some of the comments attributable to the undersigned in a new Internet blog that caters to mobile phone users by releasing text messages with court news. It was also painful to see both attorneys admit that the court could consider a multitude of sentencing factors under USSG § 1B1.4 and 18 U.S.C. § 3661, irrespective of whether the parties inserted or mentioned them in the plea agreement. (We have ordered a transcript prepared of these proceedings that will be ready within the next two days. We will publish a notice when the transcript becomes available.) This evidences that the only purpose of this motion is to hopefully take me out of the case with the expectation that the same, in some other judicial hands, will receive more favorable treatment.

1    **3.    Personal Knowledge**

2        Defendant also argues that the undersigned judge should be disqualified because he used

3    "personal knowledge to preside over a case."[6] (Docket No. 2586 at 4.)  Specifically, Defendant

4    argues that this judge used "knowledge garnered as the former Chief Judge who administered

5    the District Court at the time" of the murder of José Manuel Torres-Morales, aka "Pitufo," on

6    November 9, 2007.  Id.  At the sentencing hearing on January 25, this judge noted that the

7    murder, which occurred in front of the courthouse, interrupted the functions of the court.

8        Contrary to Defendant's suggestion, this judge's general observations revealed "nothing

9    about the [murder] that any member of the public [or occupant of the building] could not also

10   have learned . . . . This limited exposure is simply not the kind of personal knowledge of

11   disputed evidentiary facts [in a sentencing hearing five years later] with which § 455(b) is

12   concerned. "  Matter of Hatcher, 150 F.3d 631, 635 (7th Cir. 1998) (finding that knowledge

13   gained by district court judge while sitting as a spectator in the courtroom during a related case

14   was not "personal knowledge" for the purposes of § 455(b)); see also Diamondstone v.

15   Macaluso, 148 F.3d 113 (2d Cir. 1988) (judge did not gain "personal knowledge" of disputed

16   evidentiary facts by walking past peace vigils that were related to plaintiff's claim).  The murder

17   outside the courthouse on November 7, 2009, was a horrible event, but the original sentence

18   imposed in this case did not rely on any "personal knowledge" of that event.

_____

[6] § 455(b) states that a judge "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

1        Actually, the U.S. Marshal notified the undersigned, as chief judge, when the shooting

2    of a federal supervisee who was exiting the building after an appointment with his probation

3    officer took place in the morning hours. People felt fear of leaving the building. Court and

4    federal-building patrons could not enter and the FBI and the U.S. Marshal, not aware of the

5    motive or the level of danger to others within the federal compound, considered closing down

6    the building complex.  This judge went out and discussed options with the U.S. Marshals

7    Service, and later visited a Criminal Justice Act seminar being offered for CJA attorneys to allay

8    fears and have the seminar and the court continue in operation.  The undersigned did not witness

9    the murder, had no idea of the perpetrator's identity and, as a matter of fact, as of today, no state

10   prosecution has been initiated against anyone.

11   **4.     Judicial Conduct**

12       Finally, we feel we must respond to Defendant's general allegations that this judge is

13   executing a "personal agenda" not befitting a federal judge.  In this regard, we note that Circuit

14   Chief Judge Lynch has already considered, and dismissed, a complaint alleging that this judge's

15   public comments violate the Code of Conduct for United States Judges.  See Judicial Council

16   of   the   First   Circuit,   In Re Complaint No. 01-10-90030   (2011),   *available   at*

17   http://www.ca1.uscourts.gov/circuitexec/files/jmfo/2011/01-10-90030.O.pdf.  That complaint

18   alleged, as this motion does, that public comments by this judge "reflect adversely on [this

19   judge's] impartiality."  Id. at 9.  As Circuit Chief Judge Lynch stated, although the "Code of

20   Judicial Conduct does not overlap perfectly with § 455(a)," the "goal sought to be served by the

1    Canon informs our analysis" in evaluating motions for recusal.  In Re Boston's Children First,

2    244 F.3d at 168 (internal quotation marks and citations omitted).  The analysis of Chief Circuit

3    Judge Lynch is instructive for present purposes.

4           In her Order, Chief Judge Lynch reviewed comments made by this judge related to

5    certain problems facing the Commonwealth judicial system, and how they affect the

6    administration of criminal justice in federal court, specifically the District of Puerto Rico.  In

7    Re Complaint No. 01-10-90030 , at 4–6.  Those comments addressed, among other topics, the

8    dismissal of certain criminal prosecutions in the Commonwealth courts that later led to

9    convictions in federal court; the need for people to respect the administration of justice; the need

10   for all judges to work hard; the need for judges to avoid camaraderie with the bar, which could

11   affect judicial judgment; and the importance of public participation through jury trials.  Id. at

12   5–6.  Chief Judge Lynch noted that local newspapers had independently supported these

13   observations by reporting one federal case that involved defendants with a long history of

14   unsuccessful Commonwealth charges.  Id. at 5.

15          Rather than finding a violation of the Code of Conduct, Chief Judge Lynch found that

16   these comments were "directed towards the improvement of the legal system as a whole."  Id.

17   at 10.  Chief Judge Lynch also noted that this judge was "especially qualified to discuss the

18   impact of failed Commonwealth prosecutions in that criminal judicial system on the federal

19   courts."  Id. at 9.  The comments were "part of an ongoing public dialogue" concerning the

20   functioning of the local criminal justice system.  Chief Judge Lynch further held that

1   "'[c]ontributing' to the administration of justice, as contemplated by Canon 4, necessitates

2   acknowledging the existence of potential issues of concern that need to be remedied." Id. at 11.

3   Canon 2(A), which requires judges at all times to act with impartiality, does not forbid a judge

4   from acknowledging problems that have emerged over time in our criminal justice system; "nor

5   could it and be consistent with Canon 4's admonition that judges work to improve the

6   administration of justice." Id. at 13.

7        The reasoning by Chief Judge Lynch captures well the proper role of judges in our

8   system.  Moreover, this analysis is supported by Commentary to Canon 4, which notes that "a

9   judge should not become isolated from the society in which he lives."[7]  In Puerto Rico today,

10  that command has particular resonance, given our society's profound struggles with violent

11  crime, news of which has also reached stateside media.[8]  As the First Circuit has noted, in 2010,

12  Puerto Rico had a homicide rate more than "quadruple the U.S. national rate and  more than

13  double that of virtually every state." Watchtower Bible and Tract Soc. v. Sagardía de Jesús, 634

14  F.3d 3, 6 (1st Cir. 2011).  In 2011, the situation grew even worse.  The Puerto Rico Police

15  Department reported a total of 1,136 murders for the year, 11 percent more than occurred in

---

[7] Code of Conduct for United States Judges, Commentary on Canon 4 (2009).

[8] Puerto Rico's Drug Crime Problem Needs Federal Attention: View, Bloomberg (Feb. 28, 2012, 10:30 AM), http://www.bloomberg.com/news/print/2012-02-28/puerto-rico-s-drug-crime-problem-needs-federal-government-attention-view.html.

1    2010.[9] Car-to-car and drug-related shootouts and home-robbery invasions are the order of the

2    day. Firearms violations abound, and no street is safe these days.

3           The overwhelmed Puerto Rico criminal justice system is at times unable to meet the

4    demands of the rising violent crime rate and, consequently, the District of Puerto Rico has been

5    charged with the unusual responsibility of picking up the pieces and addressing what equally

6    could be local-jurisdiction crimes in federal court. This takes a heavy toll on the federal court,

7    which is not designed or equipped to become a "de facto" state court by recycling failed state

8    prosecutions.  This has given rise to a common societal perception that in Puerto Rico crime

9    pays unless the federal court intervenes. This is a matter of grave concern not only to federal

10   judges in Puerto Rico, but also to the Chief Justice of the Puerto Rico Supreme Court, who has

11   acknowledged the problems and who is looking for ways to resolve the issues that plague the

12   local system.

13          Crime here is out of control. As stated, streets are not safe, even in certain pockets of

14   metropolitan and rural areas where crime was not a common occurrence. To meet this

15   emergency, there is an approved protocol between the U.S. and Commonwealth governments,

16   where the following categories of crime are being referred exclusively to federal court for

17   prosecution:

---

[9] *Delitos Tipo I Diciembre 2011*, INSTITUTO DE ESTADÍSTICAS DE PUERTO RICO, http://www.estadisticas.gobierno.pr/iepr/Estadisticas/InventariodeEstadisticas/tabid/186/ctl/view_detail/mid/775/report_id/00975852-e14a-4339-a6c8-ab23fd36d2a1/Default.aspx (last visited Feb. 27, 2012).

1.      Possession of firearms that are stolen, with obliterated serial number, automatic in character or converted to automatic, during any drug crime or crime of violence.

2.      All cases of felons in possession of firearms, or aliens charged with felony crimes involving firearms.

3.      All cases involving firearms in domestic violence situations.

4.      All cases involving firearms and drug users.

5.      Carjackings where firearms are involved.

6.      Robbery to businesses where firearms are involved.

7.      Kidnapping cases where firearms are involved.

8.      Drive-by shootings (car-to-car or car-to-individuals).

See, e.g., Press Release, Office of Governor Luis Fortuño, Unen Esfuerzos para Combatir al Crimen (September 20, 2011). This unusual protocol, not common in any other jurisdiction under the U.S. flag, is heavily taxing the resources of federal court in Puerto Rico, where multi-defendant cases involving fifty, sixty, and over one-hundred defendants have now become a common event. Many of these are recycled–after failed attempts by local authorities–that are given a federal label in the hopes of containing the wave of crime that has taken over Puerto Rico with a good degree of impunity.

It is in reference to this sad situation that this judge has spoken publicly, first as chief judge, trying to attract the attention of those who can make a difference – judges, investigators,

1    prosecutors, police, legislature, schools, civic groups, and religious organizations. This by no

2    means translates into bias or prejudice.

3         Indeed, this judge has taken seriously his "unique position to contribute to the law, the

4    legal system, and the administration of justice."[10] It would be far easier to sit back and become

5    a passive observer of events in today's criminally-charged climate. Personally and

6    professionally, there is much logic in avoiding serious engagement with the problems in Puerto

7    Rico's justice system. A judge who maintained public silence, rubber-stamped plea agreements,

8    and imposed formulaic sentences would have more admiration from the local bar, as well as

9    fewer concerns for his own security. Nevertheless, this judge is determined to discharge his

10   responsibilities as he sees fit, consistent with his constitutional, statutory, and ethical role. See

11   generally, 18 U.S.C. § 3553(a) (describing factors to be considered in imposing a sentence);

12   U.S. v. Booker, 543 U.S. 220 (holding sentencing guidelines advisory, not mandatory). And,

13   for this, recusal is not the remedy. The remedy is ordinary review of the judge's decisions,

14   where affirmance or reversal by a higher court will address any claim of material injustice.

15   **B.    "Santobello Motion"**

16        Next, we reject Defendant's contention that he "has an incontrovertible right to prosecute

17   a Santobello hearing and request [for] specific performance as the only remedy in this case."

18   (Docket No. 2586 at 9.) To begin, we reject this demand for "specific performance" and remind

19   the Defendant that he "does not have an absolute right to plead guilty [to what he only wants],"

---

[10] Code of Conduct for United States Judges, Commentary on Canon 4 (2009).

and a district court has the discretion to reject his plea or sentence the defendant under accepted

sentencing principles.  United States v. Skerret-Ortega, 529 F.3d 33, 37 (1st Cir. 2008) (citing

Santobello v. New York, 404 U.S. 257, 262 (1971)).  See also USSG § 1B1.4 (stating that in

determining a criminal sentence within the advisory guidelines, departure or variance, the court

may consider any information concerning the background, character, and conduct of the

defendant, unless otherwise prohibited by law); see also §§ 3553(a), 3661.

Next, we address Defendant's argument that the government breached the plea

agreement because it was "duty bound to defend [it] in all its aspects." (Docket No. 2586 at 10.)

At the change-of-plea hearing, the government explicitly stood by the plea agreement's

recommended sentence of 327 months.  (Docket No. 2559 at 22.)  We reject Defendant's

argument that the government's compliance with our request to produce Carlos Burgos as a

cooperating witness constituted a breach of the agreement.  This court wanted to hear Carlos

Burgos' testimony about the knowledge he may have had regarding a murder of a supervisee

at the doorsteps of this court.

We reject Defendant's argument that the government was "aware that this was

insufficient time to prepare for such a serious allegation of murder" and, thus, breached the

agreement.[11]  Like the First Circuit, "we are wary of government claims that the prosecution

---

[11] At our most recent hearing of February 22, 2012, defense counsel could not explain what exculpatory evidence or line of cross-examination it might have raised.  See United States v. Diaz-Villafane, 874 F.2d 43, 46 (1st Cir. 1989) (noting that defendant did not suggest line of cross-examination or material evidence to submit and that the "there was scant potential for surprise" because the PSI had "been available to defendant for upward of a week before the hearing"). Nevertheless, we have already informed the Defendant that we will provide his counsel with more time to prepare for the new sentencing hearing.

1    'technically' complied with the terms of the agreement when the net effect of the government's

2    behavior undermines the 'benefit of the bargain' upon which a defendant has relied." United

3    States v. Frazier, 340 F.3d 5, 10 (1st Cir. 2003).  In the present case, however, "we hold that the

4    government adequately balanced its promise-keeping and disclosure obligations." United States

5    v. Saxena, 229 F.3d 1, 8 (1st Cir. 2000).  Compliance with our request to call witnesses did not

6    violate the plea agreement.  See id. at 7 (1st Cir. 2000) (rejecting argument that government

7    breached plea agreement because "the prosecutor reported the newly-discovered facts to the

8    court, but nevertheless stuck by the government's agreed recommendations.").

9           Likewise, we reject the argument that the government breached the plea agreement by

10   "allowing the sentencing hearing to be conducted in the way it was conducted," and because

11   they disclosed Burgos' grand jury transcripts to defense counsel eighteen hours before the

12   sentencing hearing, knowing that she "would have difficulty printing them and reviewing

13   them." (Docket No. 2586 at 11.)  Neither the government's conduct in response to this court's

14   order to obtain Burgos' testimony nor its alleged plan to take advantage of defense counsel's

15   inability to access a functioning printer fall within the scope of the plea agreement.  Among

16   other things, the agreement contains the sentence recommended by the government and warns

17   the Defendant that the court "may impose a harsher or lesser sentence" despite the

18   recommendation, but it remains silent on the topic of the government's response to requests by

19   the court for witnesses or additional facts.  (Docket No. 2141 at 4–5.)  By its own terms, the

20   agreement disavows the existence of any "additional promises" not contained within the

document and, as such, is a fully integrated agreement.[12]  (Id. at 9.)  We will not interpret its

silence to carry an implicit promise by the government to stymy legitimate requests by this court

for relevant information.  Defendant got what he bargained for; the government recommended

the sentence as it promised and did not breach the agreement.    See United States v.

Mata-Grullon, 887 F.2d 23, 24 (1st Cir. 1989) (internal quotation marks and citations omitted)

(noting that "the government must bring all relevant facts to the judge's attention and its

recommendations need not be 'enthusiastic'").

Here, we also point out to a practice observed in state-court criminal prosecutions which,

like an epidemic, is infecting federal practice in this district. The volume of criminal litigation

in state court is so high that plea agreements are never or rarely ever questioned at the time of

sentencing. This is creating a scenario where there is almost absolute certainty that the criminal

sentence recommended by the parties is going to govern the disposition of the case.  Attorneys

set the sentence, the judge endorses it. Some federal practitioners are trying hard to impose that

custom in federal court. That practice sets a dangerous precedent for federal court because at

the federal level, district judges should strive to carry out honesty in sentencing.  A

recommendation as to sentencing is precisely that–a recommendation, and we advise the bar not

to expect that we will rubber-stamp all kinds of plea-bargained issues and recommendations to

finalize criminal cases.  Federal judges should, and this judge will, look at the picture in the

---

[12] See Tina M. Woehr, The Use of Parol Evidence in Interpretation of Plea Agreements, 110 Colum. L. Rev. 840, 851–53 (2010) (discussing scope and interpretation of plea agreements).

1    post-presentence report and decide the final disposition on the merits of the post-presentence

2    report status, in light of the plea agreement.  Copying the state practice is an abdication of

3    sentencing responsibility and something we are not ready to do.  Exercising full and

4    independent sentencing authority is not grounds for recusal, the same way that exercising our

5    sentencing prerogatives and demanding more from the government does not constitute a breach

6    of the plea agreement.  Judges in the federal system can call witnesses and even interrogate

7    them. We are not passive observers. Fed. R. Evid. 614.

8         Moreover, we, as federal judges, have an obligation to steer our courtrooms away from

9    state plea-bargaining practices that only result in societal distrust of the criminal justice system.

10   That, we should not do. That, this judge will not do.

11        Finally, we reject Defendant's allegation that the prosecutors' alleged failure to provide

12   "approximately 150 pages of DEA-6s and other reports" constituted a breach of the agreement.

13   (Docket No. 2586 at 11.)  At our hearing of February 22, 2012, defense counsel did not identify

14   the documents referred to in their motion, and the government disavowed knowledge or

15   familiarity with the "DEA-6s" in this case.  At the February 22 hearing, we informed defense

16   counsel that we would give them further time to prepare and gather the documents that they

17   argued would exculpate Defendant.  We find there is no need for a "Santobello hearing," and

18   the government did not breach the agreement – it simply obeyed our order for production of

19   evidence.  As discussed above, the terms of the plea agreement are explicitly limited to those

20   within the four corners of the document, which clearly did not contemplate the situation that

1    emerged at the sentencing hearing. "The government's obligation to furnish relevant

2    information to the sentencing court does not vanish merely because the government has a

3    corollary obligation to honor commitments made under a plea agreement." Saxena, 229 F.3d

4    at 6.

5          Finally, even though we have decided to hold another sentencing hearing to give defense

6    counsel more time to prepare, we note that this court has the power to find sentencing factors

7    by a preponderance of the evidence, and "a sentencing court may consider acquitted conduct

8    in determining the applicability vel non of a sentencing enhancement." United States v. Paneto,

9    661 F.3d 709, 715 (1st Cir. 2011) (citing United States v. Watts, 519 U.S. 148, 157 (1997)).

10   Relevant conduct proved by a preponderance standard can include acquitted conduct, and we

11   are "entitled to rely on circumstantial evidence and draw plausible inferences therefrom." Id.

12   at 716 (citing United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009)).  We are aware that

13   such judge-found "sentencing factors may guide or confine a judge's discretion in sentencing

14   an offender 'within the range prescribed by statute,' [but] cannot increase the maximum

15   sentence a defendant might otherwise receive . . . ." United States v. O'Brien, 130 S. Ct. 2169,

16   2174–75 (2010) (citing Apprendi v. New Jersey, 530 U.S. 466 (2000)); see also United States

17   v. Portorreal, 413 Fed. Appx. 314, 315 (1st Cir. 2011) ("As Apprendi requires, [defendant]

18   received a sentence that was within the statutory maximum for the drug quantity he admitted

19   to at his plea hearing.").  However, in the present case, the plea agreement made clear that the

1    penalties for Count One of the indictment include a maximum term of life imprisonment.

2    (Docket No. 2259 at 2.)

3    **C.    Notice of Appeal**

4         The net result of the hearing to reconsider sentence, held on February 22, 2012, was very

5    favorable to the Defendant in that the corrected criminal judgment entered on February 8, 2012,

6    was vacated, along with the Fed. R. Crim. P. 11 colloquy that preceded sentencing, because the

7    court found that the colloquy suffered from at least two important defects.

8         At the hearing of February 22, 2012, and contemporaneous with the rulings just

9    mentioned, defense counsel Sandoval informed the court of her concern regarding the time to

10   appeal any final order.  The typical fourteen days of Federal Rule of Appellate Procedure

11   4(b)(1)(A) would expire the same day of the hearing, February 22, 2012, because the corrected

12   judgment had been entered on February 8, 2012.

13        In order to meet that concern, the court expressed on the record that, in order to be on the

14   safe side, we would extend any time for appeal surrounding the incidents under discussion an

15   extra thirty days. See Fed.R.App.P. 4(b)(4). Ms. Sandoval, not being sure in her own mind

16   whether the court had jurisdiction to extend a time for appeal, informed the court that it should

17   not be surprised if it found a protective notice of appeal covering the case filed the next day.

18        We have examined the docket and find there is no protective notice of appeal on record

19   as proposed by Ms. Sandoval. What the record contains is a regular notice of appeal without

20   qualification of any kind, where the Defendant seeks appellate review of the judgment imposed

1    on February 8, 2012 (Docket No. 2565), as well as our Order entered on February 22, 2012

2    (Docket No. 2587), in which we set aside the sentence imposed on February 8 and denied the

3    "Santobello motion" and motion for recusal.

4         We note that, as this record stands today, there is no final criminal judgment.  All we

5    have is a plea agreement that the Defendant wants the government to honor and that he wants

6    to keep and protect.  All that remains to be done to give finality to this case is to hold a

7    supplemental plea colloquy under Fed. R. Crim. P. 11 to cure the defects of the earlier colloquy

8    and to then impose a criminal sentence.

9         We observe that the items presently on appeal are not appealable as a matter of right at

10   this stage of the proceedings, because they are not final dispositions as required by 28 U.S.C.

11   § 1291.  Only the court's refusal to recuse can be reviewed discretionarily by the Court of

12   Appeals, not by means of the regular appeal filed, but by the extraordinary writ of mandamus.[13]

13        Therefore, we suggest that, on this record, our dispositions imposing judgment on

14   February 8, 2012 (Docket No. 2565), and then setting aside that judgment and sentence; denying

15   the Santobello motion; and denying the motion for recusal (Docket No. 2587), lack the finality

16   requirement of 28 U.S.C. § 1291 to permit an appeal as a matter of right, and none of them seem

---

[13] The First Circuit does not favor mandamus review of refusals to disqualify by a district judge as a matter of routine practice.  In re United States, 158 F.3d 26 (1st Cir. 1998). Only in cases where the issue of partiality has been broadly publicized against the district court and the claim of bias cannot be labeled as frivolous will the circuit entertain mandamus review.  Normally, it is through post-final judgment appeal that refusals to recuse made by a defendant are reviewed along with the final judgment in the criminal case.

to qualify for interlocutory appeal or appeal by permission under 28 U.S.C. § 1292(b) and Fed. R. App. P. 5.

This case should proceed to conclusion expeditiously. Once the final judgment in the criminal case is entered, any alleged error, procedural or otherwise, can be reviewed by the Court of Appeals.

**D.      What Remains To Be Done**

We will now set a new supplemental plea colloquy under Fed. R. Crim. P. 11, based on the plea agreement between the government and Defendant.  The purpose is to correct the colloquy failures that were pointed out by counsel and which indeed the court did not cover. Defendant wants to keep his plea agreement, and we will respect that. After holding that supplemental change-of-plea colloquy, we will proceed to sentence Defendant.   On that occasion, the murder of José Manuel Torres-Morales, aka "Pitufo," on November 9, 2007, will not be considered.  After much reflection, we have decided that the following eight factors give us pause:

1.      No murder was charged in this case.

2.      The murder, as a potential sentencing factor, first surfaced twelve days before the sentencing hearing.

3.      The murder, compared to the indicted crimes, is the "tail which wags the dog of the substantive offense."  United States v. Lombard, 72 F.3d 170, 176 (1st Cir. 1995).

4.    Defense counsel's failure to meaningfully cross-examine the murder witness during the first sentencing hearing.

5.    Our own Rule 11 colloquy failures.

6.    The fact that Defendant's career-offender status means that he will already face a hefty sentence.

7.    The fact that local authorities have not had an opportunity to receive and analyze the recently-discovered evidence for potential state prosecution.

8.    Our own sense of justice, fairness, and concern for due process.

For the foregoing reasons, we hereby **DENY** the Defendant's Motion for Recusal and Motion for a <u>Santobello</u> Hearing.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 28th day of February, 2012.

S/José Antonio Fusté
JOSE ANTONIO FUSTE
U. S. District Judge