# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JOSE COLON-DE-JESUS (01),

    Defendant.

Criminal No. 10-251 (JAF)

## OPINION AND ORDER

Pending before this court is an amended motion for recusal filed by Defendant José Colón-de-Jesús ("Movant"). (Docket No. 2809-1.) Movant argues for recusal under 28 U.S.C. § 455(a) and (b), as well as 28 U.S.C. § 144. (Docket No. 2809-1.) I discuss his arguments under each statute and, finding them meritless, deny the motion.

### I.

### Procedural Background

On November 10, 2010, Movant entered a guilty plea in this case, (Docket Nos. 689; 690) and, after several motions to continue, the sentencing hearing has been scheduled for Friday, July 6, 2012. (Docket No. 2768.) Movant has been represented by attorney Anita Hill-Adames since the case's inception. However, the present motion was prepared by attorney Rafael Castro-Lang, who initially tendered it to Movant for filing as a pro-se document. (Docket Nos. 2803; 2809.) A few days later, on June 29, 2012, Mr. Castro-Lang filed a notice of appearance in the case, acknowledged authoring the motion, and filed the amended motion at bar, which did not materially differ from the original motion. (Docket

1   No. 2809.)  Attorney Hill refused to co-sign the motion to disqualify the presiding judge.

2   (Docket Nos. 2808; 2809.)   Attorney Castro-Lang has not participated in this case for

3   Defendant until now.  We surmise he has made a special appearance to address the recusal

4   or the ensuing post-sentence appeal.

5                                                              **II.**

6                                                  **Recusal Standard**

7   **A.      28 U.S.C. § 144**

8          Section 144 demands recusal whenever "a party to any proceeding in a district court

9   makes and files a timely and sufficient affidavit that the judge before whom the matter is

10  pending has a personal bias or prejudice either against him or in favor of any adverse party."

11  28 U.S.C. § 144.  After a party files such an affidavit, § 144 states that "'another judge shall

12  be assigned to hear such proceeding.'   The next paragraph sets forth a timeliness

13  requirement . . . , [which] provides that the party can only file one such affidavit in any case,

14  and requires a certificate of counsel of record that the affidavit is made in good faith."  In re

15  Martinez-Catala, 129 F.3d 213, 218 (1st Cir. 1997) (citing § 144).   But, "courts have

16  responded to the draconian procedure—automatic transfer based solely on one side's

17  affidavit—by insisting on a firm showing in the affidavit that the judge does have a personal

18  bias or prejudice toward a party, and also by insisting on strict compliance with the

19  procedural requirements of the section."  Id.

20  **B.      28 U.S.C. § 455**

21         Movant has "invoked both section 455(a) and section 455(b)(1) . . . . [W]e focus on

22  the impartiality language of section 455(a) because it covers the same ground and reaches

23  even further."  Id. at 220.  The Supreme Court has stated that "§ 455(a) expands the

1    protection of § 455(b), but duplicates some of its protection as well." [1]   Liteky v. United

2    States, 510 U.S. 540, 552 (1994).

3         In this circuit, recusal is appropriate when the facts asserted "provide what an

4    objective, knowledgeable member of the public would find to be a reasonable basis for

5    doubting the judge's impartiality."  In re Boston's Children First, 244 F.3d 164, 167 (1st

6    Cir. 2001) (quoting In re United States, 666 F.2d 690, 695 (1st Cir. 1998)).   "While

7    recognizing that the challenged judge enjoys a margin of discretion, [the First Circuit] has

8    repeatedly held that doubts ordinarily ought to be resolved in favor of recusal.   Under

9    § 455(a), this court asks whether an objective, reasonable member of the public, fully

10   informed of all the relevant facts, would fairly question the trial judge's impartiality."  In re

11   United States, 441 F.3d 44, 56–57 (1st Cir. 2006) (internal quotation marks and citations

12   omitted).  Although the "appearance of partiality" necessitates recusal, "[t]his does not mean

13   that required recusal can be based on an unsupported, irrational, or highly tenuous

14   speculation.'"  In re Martinez-Catala, 129 F.3d at 220 (quoting In re United States, 666 F.2d

15   at 694 (internal quotation marks omitted)).

16                                           **III.**

17                                         **Analysis**

18   **A.    28 U.S.C. § 144**

19        Movant's motion mentions § 144 very briefly.  As discussed above, § 144 contains

20   several procedural requirements, including the timely filing of an affidavit, "accompanied

---

[1] § 455(a) states that a judge "shall disqualify himself in any proceeding in which its impartiality might reasonably be questioned." § 455(b) states that a judge "shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

1  by a certificate of counsel of record stating that it is made in good faith."  § 144.  The First

2  Circuit has demanded "strict compliance" with these requirements.  <u>In re Martinez-Catala</u>,

3  129 F.3d at 218.  He did submit an amended motion with new translations, but Movant has

4  filed no such certificate of counsel of record stating that the affidavit was made in good

5  faith.    That omission alone would prove fatal, but § 144 also contains a timeliness

6  requirement: The affidavit "shall be filed not less than ten days before the beginning of the

7  term at which the proceeding is to be heard."  § 144.  Here, the affidavit accompanying the

8  amended recusal motion was filed <u>seven days</u> before the sentencing proceeding.  (Docket

9  Nos. 2768; 2809.)  A court in this district has found a § 144 challenge brought ten days

10  before sentencing untimely.  <u>United States v. Bravo Fernandez</u>, 792 F. Supp. 2d 178, 183–

11  84 (D.P.R. 2011) (dismissing § 144 challenge for untimeliness and failure to include

12  counsel's certificate of good faith).  Moreover, § 144 "require[s] that the party moving for

13  recusal of the judge raise the issue 'at the earliest moment after acquiring knowledge of the

14  facts providing a basis for disqualification.'"  <u>Id.</u> at 182 (quoting <u>Cordova Gonzalez v.</u>

15  <u>United States</u>, 987 F.Supp. 87, 90 (D.P.R. 1997)).  The articles and events cited in the

16  recusal motion took place months before Movant filed it.  Because Movant failed to comply

17  with the procedural requirements, his challenge under § 144 fails.  <u>In re Martinez-Catala</u>,

18  129 F.3d at 218; <u>Bravo Fernandez</u>, 792 F. Supp. 2d at 184.  Therefore, I consider his

19  arguments under § 455 alone.

20  **B.    <u>28 U.S.C. § 455</u>**

21       Movant argues that this judge should disqualify himself from sentencing him due to

22  the "appearance of bias and prejudice that warrant[s] recusal."  (Docket No. 2809-1 at 5.)

23  Movant argues for recusal based on statements made by the undersigned in an opinion piece

1    and interview in a local newspaper, EL NUEVO DÍA, as well as at the sentencing of two of

2    his codefendants, Carlos Sevilla-Oyola and José Reyes-Santiago.[2]  (Id.)  The arguments in

3    his motion echo the allegations in the accompanying affidavit.  I address each allegation in

4    turn below and, finding no reasonable basis for doubting my impartiality, deny Movant's

5    motion for recusal.

6    **C.        Comments in the Press**

7            I preface my analysis by offering some background information on the situation in

8    the District of Puerto Rico.  I find it useful to note that the First Circuit has already

9    considered, and dismissed, a complaint alleging that similar comments by this judge violate

10   the Code of Conduct for United States Judges, in an opinion by Chief Judge Lynch.[3]  See

11   Judicial Council of the First Circuit, In Re Complaint No. 01-10-90030 (Feb. 11, 2011)

12   (hereinafter "Complaint No. 01-10-90030") available at http:// www. ca1. uscourts.gov/

13   circuitexec/files/jmfo/2011/01-10-90030.O.pdf.

14           Like the recusal motion at bar, that complaint alleged that public comments by this

15   judge reflected adversely on my impartiality.[4]  Id. at 9.  In dismissing that complaint, Chief

16   Judge Lynch reviewed my comments in the local newspaper about problems facing the

17   Commonwealth judicial system and their unique effect on the administration of criminal

---

[2] I see no need to transfer this motion to another judge under the circumstances of this case.  See In Re United States, 158 F.3d at 34 ("Although a trial judge faced with a section 455(a) recusal motion may, in her discretion, leave the motion to a different judge, no reported case or accepted principle of law compels her to do so.").

[3] I have already dealt with a substantially similar recusal motion in the same case and discussed many of the same issues in my Opinion and Order of February 28, 2012.  (Docket No. 2602.)

[4] The First Circuit has stated that although the "Code of Judicial Conduct does not overlap perfectly with § 455(a)," the "goal sought to be served by the Canon informs [the] analysis" in evaluating motions for recusal.  In Re Boston's Children First, 244 F.3d at 168 (internal quotation marks and citations omitted).  Thus, the analysis of Chief Circuit Judge Lynch in that opinion proves instructive for present purposes.

1   justice in federal court in the District of Puerto Rico.  Id. at 4–6.  Chief Judge Lynch noted

2   that my comments were preceded by statements made to the media by the U.S. Attorney,

3   who noted the dearth of successful criminal prosecutions in Commonwealth courts and then

4   met with "the Chief Justice of the Commonwealth courts to discuss the problems

5   identified."  Id. at 5.  In fact, the comments by this judge and by the U.S. Attorney came in

6   the wake of a media frenzy surrounding the "Pájaros Massacre" trial, a highly-publicized

7   criminal trial in Commonwealth court.[5]  As noted by Chief Judge Lynch, the dismissal of

8   charges against the defendants in the "Pájaros Massacre" bench trial was "subject to

9   criticism in the media," and "it was reported that both the Commonwealth court and

10  Commonwealth justice department authorities investigated the dismissal by the

11  Commonwealth judge, and that he was reassigned to hear only civil cases."  Id. at 3.

12      Among other things, my comments at issue in that complaint addressed:  The

13  unsuccessful prosecution or dismissal of certain criminal cases in the Commonwealth courts

14  that later led to convictions in federal court; the need to respect the administration of justice;

15  the need for judges to avoid camaraderie with the bar; and the importance of public

16  participation through jury trials (the "Pájaros Massacre" trial was a bench trial).  Id. at 5–6.

17  I also expressed concern "that federal prosecutors were successful based on evidence of

18  crimes" that failed to result in successful prosecutions in the Commonwealth courts.[6]  Id. at

19  5.

---

[5] Movant actually points to different comments by this judge about the same trial in his Motion for Recusal.  See infra Part III.A.3

[6] I also pointed to "close to 30 files of federal criminal defendants who had records of unsuccessful Commonwealth criminal charges," and found that federal court records "showed many federal defendants with a long history of Commonwealth criminal charges for which they had never been held responsible." Complaint No. 01-10-90030 at 5.  Chief Judge Lynch noted that the local newspaper had "independently

1       Rather than finding a violation of the Code of Conduct, Chief Judge Lynch found

2  that my comments were "directed towards the improvement of the legal system as a whole."

3  Id. at 10.  Chief Judge Lynch found that I "was especially qualified to discuss the impact of

4  failed Commonwealth prosecutions in that criminal judicial system on the federal courts."

5  Id. at 9.  She found those comments to be "part of an ongoing public dialogue" on the local

6  criminal justice system.  Chief Judge Lynch further held that contributing "to the

7  administration of justice, as contemplated by Canon 4, necessitates acknowledging the

8  existence of potential issues of concern that need to be remedied."  Id. at 11.  Canon 2(A) of

9  the Code of Conduct, which requires judges to act with impartiality at all times, does not

10  forbid a judge from acknowledging problems that have emerged over time in any criminal

11  justice system; "nor could it be inconsistent with Canon 4's admonition that judges work to

12  improve the administration of justice."  Id. at 13.

13       The opinion by Chief Judge Lynch highlights the unique position of judges in this

14  district.  As stated in the Commentary to Canon 4, "a judge should not become isolated from

15  the society in which he lives."[7]  In Puerto Rico today, that command has particular

16  resonance, given our society's profound struggles with violent crime and corruption, news

17  of which has also reached stateside media.[8]  The First Circuit has also commented on the

18  island's "endemic violent crime," explaining that in 2009, Puerto Rico had a homicide rate

---

supported [my] observations by adding to the article its information on one federal case involving defendants with a long history of unsuccessful" Commonwealth charges.  Id.

[7] Code of Conduct for U.S. Judges, Canon 4 cmt. (2009).

[8] Catherine Shoichet, Puerto Rico:  A forgotten front in America's drug war?, CNN (June 9, 2012), http:// articles.cnn.com/ 2012-06-09/justice/justice_puerto-rico- drug- trafficking_1_drug- trafficking- drug-cartels - drug - war/2?_s=PM:JUSTICE; Puerto Rico Prodded to Get Tough on Police, N.Y. Times (Oct. 4, 2011); Editorial, Unconstitutional Policing, N.Y. Times (Sept. 14, 2011); Lizette Alvarez, Murder Rate and Fear Rise in Puerto Rico, N.Y.Times (June 20, 2011), http://www. nytimes.com/2011/06/21/us/21crime. html?pagewanted=all.

1  more than "quadruple the U.S. national rate and more than double that of virtually every

2  state.  It is a major drug transit point, and drug dealing has led in a number of cases to

3  corruption among local police."  Watchtower Bible and Tract Soc'y. v. Sagardía de Jesús,

4  634 F.3d 3, 6 (1st Cir. 2011).  The U.S. Department of Justice has called it "a time of crisis

5  in public safety," noting that "[c]ontrary to national trends, violent crime increased overall

6  in Puerto Rico by 17% from 2007 to 2009.  In 2010, Puerto Rico saw the second highest

7  number of murders in its history, a trend that [was] escalating in 2011."  U.S. D.O.J.,

8  Investigation of the Puerto Rico Police Department at 5 (Sept. 5, 2011), available at

9  http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf.   In 2011, the Puerto Rico

10  Police Department reported a total of 1,136 murders for the year, an eleven percent increase

11  from 2010.[9]  And last year, a U.S. Department of Justice investigation and report released

12  findings that the Puerto Rico Police Department has allegedly engaged in ongoing patterns

13  of misconduct that violate the Constitution and federal law.[10]  Fatal car-to-car shootouts,

14  carjacking incidents, and home-robbery invasions dominate newspaper headlines practically

15  every day.

16       In 2010, in response to the unusual number of failed Commonwealth prosecutions,

17  the U.S. Attorney of Puerto Rico signed a Memorandum of Understanding ("MOU") with

18  the Commonwealth Department of Justice and the Puerto Rico Police Department.  The

19  unprecedented MOU refers certain categories of crimes—which are prosecuted as state

20  crimes virtually everywhere else in the United States—exclusively to federal court for

_____

[9]Instituto de Estadísticas de Puerto Rico, Delitos Tipo I Diciembre 2011, http:// www. estadisticas. gobierno.pr/iepr/ Estadisticas/ InventariodeEstadisticas/ tabid/ 186/ ctl/ view_detail/ mid/775/ report_id/ 00975852 -e14a-4339-a6c8-ab23fd36d2a1/Default.aspx (last visited Feb. 27, 2012).

[10] U.S. D.O.J.,  Investigation of the Puerto Rico Police Department  (Sept. 5, 2011),  available at http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf.

1    prosecution.    Such crimes include, inter alia: all cases involving firearms in domestic

2    violence situations; all offenses involving illegally-obtained firearms; virtually all drug

3    cases involving firearms; and most carjacking cases involving firearms.  See Press Release,

4    Office of Governor Luis Fortuño, Joint Efforts to Combat Crime (translation ours) (Sept. 20,

5    2011) (listing categories of crimes covered by MOU); (see also Docket No. 2602 at 12.).  As

6    I discussed in my Opinion and Order of February 28, 2012, the wholesale referral of cases

7    for federal prosecution "takes a heavy toll on the federal court, which is not designed or

8    equipped to become a de facto state court by recycling failed state prosecutions."  (Docket

9    No. 2602 at 10 (dismissing a similar motion for recusal by codefendant Sevilla-Oyola).)

10              Bearing in mind that a judge should not become isolated from the society in which he

11   lives, the undersigned has written opinion pieces in a local newspaper and given interviews

12   in the hopes of sparking public dialog on our plight.  Chief Judge Aida Delgado-Colón has

13   joined me in one of these interviews and has sponsored other interviews with the same

14   purpose.  Instead of simply focusing on the crime and corruption, I have urged the education

15   reform and social change necessary to combat such widespread systemic violence and

16   crime.  Recently, the Retired Teachers Association of Ponce, Puerto Rico, reached out to me

17   after the publication of my opinion piece "¡Óyeme!" ("Listen to me!") in the newspaper EL

18   NUEVO DÍA.  (Docket No. 2809-4.)  I traveled to Ponce to meet with them and discuss

19   education reform and the creation of after-school programs to reach out to the youth

20   threatened by the waves of drugs and violence battering our island.[11]

_____

[11] Chief Judge of the State of New York and Chief Judge of the New York Court of Appeals, Jonathan
Lippman, has carefully surveyed the arguments for and against judges engaging in extrajudicial activity.
Jonathan Lippman, The Judge and Judicial Conduct: Challenges, Lessons Learned, and a Proposed
Framework for Assessing the Propriety of Pursuing Activities Beyond the Bench, 33 Cardozo L. Rev. 1341
(2012).  After an extensive review, Judge Lippman concluded: "All of us benefit from having an engaged

1    At issue in the motion at bar are an opinion piece and an interview which appeared in

2    the local newspaper.  As the text of the opinion piece and interview show, Movant's

3    allegations lack a factual basis and do not merit recusal.

4         **1.    <u>Opinion piece of January 7, 2012</u>**

5    Movant alleges that the undersigned published an opinion piece on January 7, 2012,

6    in the local newspaper EL NUEVO DÍA, "where he attributes himself [sic] the power to

7    impose eternal punishment on those defendants whom he considers behave [sic] like

8    animals because he has to take all the measures available to have people live like humans

9    created in the image and likeness of 'our Creator,'" which reveals that the undersigned

10   "applies personal religious concepts when sentencing that reflect bias and prejudice against

11   defendants whom he again characterizes as animals." (Docket No. 2809-1 at 5.) Turning to

12   the text, it becomes apparent that the undersigned said nothing of the sort.  In the piece, I

13   lamented the wave of violence that threatens to engulf Puerto Rico, and called for education

14   reform, civics classes, and various societal reforms.  The certified translation of the

15   protested passage reads:

16        We cannot continue living this way, without values, without respect for the
17        inherent dignity of all human beings.  We cannot continue to live dodging
18        bullets.  We have to deal with education, the teaching of values and respect.  It
19        is necessary to take all the measures at our reach to live like human beings,
20        created in the image and likeness of our Creator.  Every time that a weapon
21        detonates, insensibly wounds or kills someone, we end a life and the purpose
22        of life to which every human being is entitled just for being human.  There is
23        no beast or wild animal that does the things that we humans do.  There is no

_____

judiciary that is visible, accessible, and organically connected to society and to all those for whom it
administers justice."  <u>Id.</u> at 1388.  Judge Lippman's explanation for this belief resonates with our own view.
As Judge Lippman wrote: "Within applicable ethical boundaries, judges should aspire and be encouraged to
pursue public and private opportunities to contribute to their communities and profession beyond the
courtroom."  <u>Id.</u> at 1384.  It would be unrealistic to expect judges in Puerto Rico to stand by in "ivory-tower
isolation" while Puerto Rico undergoes one of the worst crime waves of its history.  <u>Id.</u>

1    excuse, and there has to be an eternal punishment for one who becomes
2    dehumanized and behaves worse than a wild animal.
3

4    (Docket No. 2809-4.)   These general statements could apply to war, genocide or any

5    situation involving human intra-species violence.   Nowhere in the publication is there a

6    reference to the present case, to criminal defendants as animals or to any other specific

7    criminal proceeding.

8           Additionally, Movant's allegations of a religious agenda based on this passage are

9    humorous—but meritless.   The use of the phrase "created in the image and likeness of our

10    Creator" in no way translates to a declaration "that the Judge applies personal religious

11    concepts when sentencing." (Docket No. 2809-1 at 5.)   It is a basic tenet of Judeo-Christian

12    religions that human beings were created by God in its image and likeness.

13           As the Supreme Court has held, the *de minimus* use of such a common Judeo-

14    Christian principle does not offend the Constitution or indicate an insidious religious

15    agenda, and the "[i]nvocation of the Almighty by our public figures, at all levels of

16    government, remains commonplace.  Our coinage bears the motto, 'IN GOD WE TRUST.'

17    And our Pledge of Allegiance contains the acknowledgment that we are a Nation 'under

18    God.'" McCreary County, Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 888–89

19    (2005).   As the Supreme Court has repeatedly stated, "'[w]e are a religious people whose

20    institutions presuppose a Supreme Being.'" Id. (quoting Zorach v. Clauson, 343 U.S. 306,

21    313 (1952)).   Movant's argument fails as "unsupported, irrational, [and] highly tenuous

22    speculation," despite his slapstick attempt to sensationalize my statements.   In re Martinez-

23    Catala, 129 F.3d at 220 (internal quotation marks and citations omitted).

1    **2.    Interview of May, 4, 2012**

2    Movant also points to an interview of the undersigned, which appeared in the local

3    newspaper EL NUEVO DÍA on May 4, 2012.  He argues that the undersigned "does not

4    follow the law but rather his conscience and that he feels fear when he looks at criminal

5    defendants because there is nothing that distinguishes them from animals." (Id.)  Again,

6    Movant misrepresents my statements by quoting them out of context.  I did, indeed, mention

7    following my conscience, but did not state or insinuate that I do not follow the law.  Judges

8    are permitted to have a conscience, and I mentioned mine as part of a reply to a question

9    regarding widespread criticism of the Commonwealth courts "because of decisions of

10   judges and their short sentences in cases of atrocious crimes," asking what "can be done to

11   improve the system."  (Docket No. 2809-3.)  I commented on the difficult position of

12   Commonwealth judges, who are appointed but lack lifetime tenure (and thus must face the

13   political ordeal of reappointment), stating:

14       If I had to be subject to a confirmation every certain number of years, I would
15       have gone home a long time ago . . . . There is a tremendous pressure not to do
16       anything that may eventually cost you your job, and in this business that
17       cannot exist.  In this business you have to decide, right or wrong, according to
18       your conscience, what you think is right. If it's wrong, let them revoke you.
19
20   Id.

21   I next suggested that judges needed "more judicial independence" and less partisan

22   strife during confirmations, and I praised lifetime judicial appointments.  Id.  It becomes

23   apparent that, in context, the call to follow one's conscience (and risk reversal) referred to

24   the need for judges to follow the law and ethics' canons without fear of political

25   repercussions (*i.e.,* fear of losing their position).

1    Movant next alleges that the undersigned publicly stated "that he feels fear when he

2   looks at criminal defendants because there is nothing that distinguishes them from animals."

3   (Docket No. 2809-1 at 5.)  Once again, his attempted use of an out-of-context quote fails.  In

4   that interview, a reporter asked me about "the violence that prevails in [the

5   Commonwealth]."  (Docket No. 2809-3.)  The interview took place over the course of a few

6   brief minutes while I was walking out of "an activity of the Spanish-American Institute of

7   Maritime Law," where I had given a speech on the uniformity of maritime law—my area of

8   expertise before my appointment to the bench.  Of course, the press had no interest in asking

9   questions about maritime law, instead focusing on the imbalance of crime and punishment

10  in Puerto Rico and "the violence that prevails in [the Commonwealth]."  (Docket No. 2809-

11  3.)  At one point, the reporter asked if I received threats, and I replied that I had received

12  "lots of them."  Id.  She next asked if I felt afraid when I received such threats.  I explained:

13          It always has some effect, but if you choose this job, you have to do it without
14          thinking about that.  The criminal of today is not the same one of years ago.
15          You notice it even in the way they look at you and react . . . there is no
16          redeemable human fiber. You feel like you're not dealing with a normal
17          human being.  When I look, nowadays, sometimes it scares me to think that
18          there is nothing that distinguishes that person from an animal. It's incredible.
19
20  Id.

21          I cannot recall the precise words that I used with the reporter, but she is a responsible

22  member of the press, and I must live with her account of what transpired.  I cannot blame a

23  defendant pending sentence if he believes that I consider him to be an animal.  Perhaps my

24  wording was overwrought, and defendant or his recusal counsel may consider it indecorous.

25  But, I assure the defendant and his recusal counsel that it was not said with a bad purpose,

26  intent or belief that judges deal with animals and not human beings.  I was not raised and

1    educated to think that way.  My household, which includes a criminal defense lawyer, does

2    not adhere to such conceptions.  We do not teach our children any discriminatory practices,

3    and emphasize that all humans are equal.

4        The use of that language in Spanish sounds different from its translated meaning in

5    the English language.  In colloquial Spanish, those expressions are used to emphasize a

6    point, *i.e.*, persons with whom one cannot easily communicate or establish intellectual or

7    mental connection.

8        Given the subject matter (threats to the judiciary), I find that such a comment does

9    not "provide what an objective, knowledgeable member of the public would find to be a

10   reasonable basis for doubting the judge's impartiality" in this particular sentencing

11   proceeding.  In re Boston's Children First, 244 F.3d at 167 (internal quotation marks and

12   citations omitted).  An objective reader of the interview will see that "criminal of today" did

13   not refer to criminal defendants, nor did it refer to any specific individual, but to the abstract

14   category of "criminals," *i.e.,* individuals who would make such threats.  Lastly, if the

15   defendant in this case and his recusal counsel still feel the burden of my words, I sincerely

16   apologize and assure both defendant and recusal counsel that, as in the past, every defendant

17   in my court will be treated as an individual with rights and dignity, no matter what crime or

18   crimes she has committed.

19       In comparing the "criminal of today" with those of the past, I meant to highlight my

20   observation of how violent crime has mushroomed and penetrated every layer of society, to

21   an extent that I have never seen in my twenty-six years on the bench in Puerto Rico.  Judges

22   in this district get far more threats than their colleagues in the continental United States.  We

23   take precautionary safety measures, and the U.S. Marshals Service maintains modern,

1  sophisticated means of protection and surveillance of the judges in this district, along with a

2  few of my colleagues facing a similar situation on the Mexican border.

3        My word choice might have been careless in my hurried answer to questions about

4  death threats and my personal safety, but no objective reader would deem it grounds for

5  recusal.  I have no record of dehumanizing human beings.  I do not discriminate.  I have

6  great respect for humanity.  I am a believer in the preservation of dignity and respect for any

7  human being.

8        If the undersigned could be recused in this sentencing hearing for such a general and

9  out-of-context statement, he would have to recuse himself from sentencing <u>any</u> defendant in

10  <u>any</u> criminal case.  The interview does not discuss any specific defendant or case, and

11  contains no reference to Movant, his conduct or his codefendants.  I find that an objective

12  reader of the interview would not find an "appearance of partiality" necessitating recusal

13  based on this comment, and the bias argument fails as "unsupported, irrational, [and] highly

14  tenuous speculation."  <u>See</u> <u>In re Martinez-Catala</u>, 129 F.3d at 220–21 (rejecting challenge to

15  judge's comment and stressing importance of context).

16        **3.        <u>Criticism of Commonwealth Criminal Proceedings</u>**

17        Movant next argues that the undersigned's "criticism of the local trial of the "Pájaros

18  Massacre," where defendant was acquitted even the [sic] though the trial judge in that case

19  was  absolved  of  any  wrongdoing  after  being  investigated  by  the  local  Courts

20  Administration" creates the appearance of bias because, Movant alleges, the undersigned

21  "wants to use the present sentence to punish him for that case even though said conduct was

1  not part of the government's evidence against defendant had a trial been held in this case."[12]

2  (Docket No. 2809-1 at 6.)  Movant alleges that the undersigned's "action of obtaining the

3  case file for examination and his comments that after he reviewed the criminal proceedings

4  it was a 'horror story that twists your stomach and gives you a stomach ache' [sic] made

5  after Judge Jose Delgado Delgado was cleared of wrongdoing by the Courts Administration

6  investigation all create [sic] the appearance of bias and prejudice that warrant his recusal."

7      In keeping with the theme of his motion, Movant takes my comments out of context.

8  Luckily, we have the transcript of the sentencing hearing, when the comments were made.

9  The record quickly deflates his contentions.  During the sentencing hearing of codefendant

10  Reyes-Santiago, defense counsel mentioned the "Pájaros Massacre" trial and the

11  Commonwealth judge.  In response, I stated:

12      Let me say something. I don't think you should be even talking about this
13      judge, because I wasn't there.  I don't know who participated in this whole
14      thing. But you take a look at the record of that case, as I have, and I made it
15      available to you, that is an embarrassing record the way it was handled from
16      beginning to end.  It's a shame. It's a shame that something like that can
17      happen in a jurisdiction like this under the American flag. I'm not talking
18      about innocence or guilt. I'm talking about procedurally. That was a horror
19      story from the standpoint of criminal procedure. Completely not an example
20      of what a trial should be in any form or fashion. This is something, something
21      that just turns your stomach around when you read it.
22
23  (Docket No. 2770 at 100–01 (emphasis added).)

24      The transcript speaks for itself.  I was not referring to the crimes alleged in the

25  "Pájaros Massacre" trial.  My brief criticism was of the procedural aspects of the

---

[12] As discussed above, this was a very publicized Commonwealth criminal trial in which, as noted by Chief Judge Lynch, "it was reported that both the Commonwealth court and Commonwealth justice department authorities investigated the dismissal by the Commonwealth judge, and that he was reassigned to hear only civil cases."  Complaint No. 01-10-90030 at 3.  He was not reappointed upon expiration of his term.

1    Commonwealth case.  It is far from uncommon for judges to criticize the workings of other

2    courts.[13]  Moreover, I explicitly stated that that trial would not be discussed further during

3    the sentencing, and it was not.

4    **D.      Sentencing of Codefendants**

5           I begin by noting that the Supreme Court has made clear in its discussion of the

6    "extrajudicial source" doctrine that "judicial remarks during the course of a trial that are

7    critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily

8    do not support" a recusal challenge.  Liteky, 510 U.S. at 555.  Opinions formed by the

9    judge, when based on facts introduced during the proceeding, do not support a bias

10   challenge "unless they display a deep-seated favoritism or antagonism that would make fair

11   judgment impossible."  Id.  An example of such deep-seated antagonism would be, in a

12   World War One espionage trial of German-Americans, a district court judge stating: "One

13   must have a very judicial mind, indeed, not [to be] prejudiced against the German-

14   Americans" because their "hearts are reeking with disloyalty."  Id. at 555 (internal quotation

15   marks omitted).

16   **E.      Judge as "Prosecutor"**

17          Movant bases his arguments on the sentencing proceedings of two of his

18   codefendants, Carlos Sevilla-Oyola and Jorge Reyes-Santiago.  Specifically, he argues that

19   the undersigned judge "has become a prosecutor," referring to the first sentencing hearing of

---

[13] Recently, Judge Richard Posner, a well-renowned judge on the Seventh Circuit, attracted much attention for an article he wrote criticizing Justice Scalia's handling of the Arizona immigration case in the Supreme Court.  See e.g., Richard Posner, Supreme Court Year In Review Entry 11: Justice Scalia is upset about illegal immigration. But where is his evidence? SLATE (Jun. 27, 2012, 10:21 A.M.), http://www. slate.com/ articles/ news_ and_ politics/ the_breakfast_table/ features/2012/_supreme_court_year_in_review/ supreme _ court _year_in_review_justice_scalia_offers_no_evidence_to_back_up_his_claims_about_illegal_ immigration _.html (criticizing his Opinion for failing to cite his sources in support of findings).

1    codefendant Sevilla-Oyola, where witnesses were called regarding past acquitted conduct—

2    a murder—discussed in Sevilla-Oyola's presentence report.[14]   (Docket No. 2809 at 3.)

3    Tenuous at best, this argument barely qualifies as speculation; the events Movant points to

4    come from a separate sentencing proceeding, regarding a separate individual, and I have

5    given no indication of becoming a "prosecutor" in Movant's case.

6            Furthermore, Movant overlooks the fact that I set aside Sevilla-Oyola's original

7    sentence, and I issued a revised sentence that did not consider that past conduct.  (Docket

8    No. 2602 at 4.)  I explicitly stated that the uncharged murder should not be considered in

9    resentencing Sevilla-Oyola, and I did not consider it in his second sentencing hearing.[15]

10   (Id.)  Nor did I consider such acquitted or uncharged conduct in the sentencing of his

11   codefendant Reyes-Santiago, as I explicitly and repeatedly stated during his sentencing

12   hearing.  (Docket No. 2770 at 12, 39, 85.)

13           "Judges constantly form personal opinions during proceedings . . . . Inaccurate

14   findings based on those opinions may lead to reversal on appeal but not to recusal. Whether

15   the words used by the district judge suggest a lack of impartiality is a different question."  In

16   re Martinez-Catala, 129 F.3d at 219-20.  I myself vacated the first judgment in Sevilla-

17   Oyola's case, and Movant is a separate individual with a separate set of sentencing factors.

18   Movant can point to nothing other than his wild speculation that indicates that a judge in

19   control plans to become a "prosecutor" in his sentencing, and so his argument fails.

---

[14] Pursuant to Federal Rule of Evidence 614, a judge can call and interrogate witnesses.  Moreover, "sentencing factors need only be proven by a preponderance of the evidence [, and] a sentencing court may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement."  United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011) (citing United States v. Watts, 519 U.S. 148, 157 (1997)); see also U.S.S.G. §§ 5K2.0 & 2.1 (discussing use of acquitted conduct in making upward sentence departures).

[15] For more information on the Sevilla-Oyola sentencing saga, see Docket No. 2602.

1  **F.    His Codefendant's Plea Agreements**

2        Movant next argues that "based on the treatment [of codefendants] Reyes Santiago

3  and Sevilla Oyola . . . Judge Fuste will refuse to honor the . . . stipulation of [Movant's] plea

4  agreement even though he followed it with other similarly situated defendants."[16]  (Docket

5  No. 2809-1 at 8.)   He alleges that this court gave Reyes-Santiago and Sevilla-Oyola

6  sentences higher than the ones they pled for, but "honoured the plea agreement" for two

7  other "leaders," Angel Colón-de-Jesús and José Jiménez-Echevarría.  (Id. at 7.)  Even

8  accepting for the sake of argument the assumptions inherent in this statement (that Movant

9  can somehow infer bias toward him based on the sentences of two codefendants in this case

10  and that a judge is bound to "honour" all plea agreements), his argument fails.

11        Conspiracy leaders Reyes-Santiago and Sevilla-Oyola were not "similarly situated"

12  to codefendants Angel Colón-de-Jesús and José Jiménez-Echevarría.  Reyes-Santiago, who

13  committed the offense while on supervised release, had a criminal history category of IV,

14  and received enhancements for his supervisory role and the immense quantity of drugs.[17]

15  (Docket No. 2686.)  Sevilla-Oyola met the career offender requirements and had a criminal

16  history category of VI.  (Docket Nos. 2352; 2445 at 37.)   In comparison, Angel Colón-de-

17  Jesús had a criminal history category of II.  (Docket Nos. 1393; 1760.)  Jiménez-Echevarría

18  also had a criminal history category of II.  (Docket Nos. 1393; 1804.)  The advisory

---

[16] Sevilla-Oyola received a sentence of 345 months and 60 months' imprisonment, to be served consecutively, along with a supervised release term of eight years.  (Docket No. 2644.)  Reyes-Santiago received a sentence of 360 months and 60 months' imprisonment, to be served consecutively, as well as a supervised release term of ten years.  (Docket No. 2713.)

[17] I found during sentencing, by a preponderance of evidence, that he was also the owner of the "Boston Red Sox" variety of marijuana and the "right hand" of Movant, the principal conspiracy leader.  (Docket No. 2770 at 73–74.)  Based on the drug quantities and his supervisory role, he began with a base level of 38, as outlined in the presentence report.  (Id.)

1   sentencing guidelines provide for a gradient of aggravating role enhancements depending on

2   a particular defendant's role or leadership in an offense.  See U.S.S.G. § 3B1.1.  These

3   codefendants did not have "similar record[s]" or equivalent leadership roles.  See 18 U.S.C.

4   § 3553(a)(6).  As I stated during the sentencing hearing of Reyes-Santiago, I am not

5   obligated to simply "rubber stamp" the plea agreement's recommendation; Sevilla-Oyola

6   and Reyes-Santiago both had a "'Type B'" plea agreement under Fed. R. Crim.

7   P. 11(c)(1)(B)), not "a binding plea agreement (a 'Type C' agreement under Fed. R. Crim.

8   P. 11(c)(1)(C))."  United States v. Torres-Oliveras, 583 F.3d 37, 41 (1st Cir. 2009).

9        If judges were bound by the terms of all plea agreements, I could be replaced by a

10   computer that would process the plea agreement and spit out the corresponding sentence—

11   there would be no need for a presiding judge.  Trial "judges can sentence inside or outside

12   the advisory range, as long as they stay within the statutory range and consider the

13   sentencing factors arrayed in § 3553(a)—factors that include the nature of the offense, the

14   background of the defendant, the seriousness of the crime, the need to deter criminal

15   conduct, and the need to protect the public from further crimes by the defendant."  United

16   States v. Rodriguez, 630 F.3d 39, 41 (1st Cir. 2010) (citations omitted).  Departures or

17   variances in sentencing are permitted.  Greater sentencing flexibility exists today under the

18   advisory guidelines regime.

19        Movant alleges that the undersigned "want[s] to punish [Movant] for old cases that

20   were dismissed according to the law in the local courts," and points to the sentences of his

21   codefendants as proof of his unfounded statement.  (Docket No. 2809-2.)  I restate the

22   obvious: The sentencing hearings of other defendants sprang out of the same criminal case,

23   but did not actually involve Movant.  I will not sentence Movant until his scheduled hearing,

1    and I will not consider his dismissed or unsuccessful Commonwealth prosecutions in an

2    impermissible way.  I will not grant a motion for recusal in his case based on such wild

3    speculation.

4           Finally, I reject Movant's argument that my alleged "insistence on increasing [his]

5    sentence based on [my] disapproval of the Commonwealth Rules of Procedure that justified

6    dismissal of the cases" against Movant merits recusal.  (Docket No. 2809-1 at 9.)  He points

7    to nothing to support this baffling statement apart from his conclusory allegation that I

8    assume his guilt "in old local criminal prosecutions that were dismissed in accordance with

9    applicable Rules of Criminal Procedure."  Id.  The First Circuit considers "disqualification

10   appropriate only when the charge is supported by a factual basis," and there is none here for

11   such an outlandish allegation.  In re Boston's Children First, 244 F.3d at 167 (1st Cir. 2001).

12   I harbor no deep-seated animosity toward the Commonwealth Rules of Procedure, nor do I

13   automatically assume his guilt in the prior Commonwealth cases.  He points to nothing to

14   support his conclusory allegation.  I have not sentenced Movant yet, and I reject his strange

15   and speculative allegation.  As discussed above, I did not consider the "Pájaros Massacre"

16   or the murder of "Pitufo" in sentencing his codefendants, and I will not consider them in

17   sentencing Movant.  This does not mean that his past encounters with the law and the

18   disposition without prejudice of those cases do not make one wonder why such practice can

19   be found in the context of the administration of criminal justice.  There is nothing wrong in

20   gasping at that reality.

21          Because I find that my impartiality "cannot reasonably be questioned" based on

22   Movant's unsupported, speculative arguments, I find that I have "a duty to sit" in this case,

23   and I deny the request for recusal.  United States v. Snyder, 235 F.3d 42, 45–46 (1st Cir.

1    2000).  For the reasons above, the motions for recusal (Docket Nos. 2803, 2809-1) are

2    **DENIED.**

3         **IT IS SO ORDERED.**

4         San Juan, Puerto Rico, this 6th day of July, 2012.

5                                        s/José Antonio Fusté
6                                        JOSE ANTONIO FUSTE
7                                        United States District Judge